We'll call the matter of Nelson vs. the Attorney General of the United States. Good morning. Good morning. May it please the Court, my name is Kristin Sawicki, appearing on behalf of the petitioner, Michael Nelson. And could I please reserve two minutes for rebuttal? You certainly may. Great. Your Honors, the BIA's decision below should be reversed, and this case should be remanded, because Mr. Nelson began a new period of continuous residence when he entered the country in August of 2000. This is so for two reasons. First, the plain language of the cancellation of removal statute clearly says that an alien begins accruing continuous residence after having been admitted in any status. And second, the BIA's decision is inconsistent with precedent, both this Court's precedent and the Third Circuit's precedent, and it deviated from these cases without adequately explaining why. First, the plain language of 8 U.S.C. section 1229 B.A. 2 says that an alien accrues continuous residence after having been admitted in any status. Both the BIA and the government indicate that some admissions may in fact restart the clock. However, the disagreement is over what kind of admission that is. In the matter of Key Lantan, the BIA held that all that is required is a procedurally lawful entry into the country, and that involves passing through the border inspection and being inspected by an authorized immigration official. Here, Mr. Nelson, when he entered the country in 2000, he did pass through border patrol and he did present his green card. He thus met the requirements for an admission, and at that time, under the language of the statute, he started a new period of continuous residence. So that because he left for a two-day trip to Canada and came back after committing a crime, he deserves cancellation or is more deserving or is eligible for cancellation of removal, where a similarly situated alien who did not leave the country and come back is not. Well, under the language of the statute, yes, that reading does show... Why would that be so? Why? Well, the BIA has already allowed that an alien who illegally reenters the country can begin a new period of continuous residence, and that was in the matter of Cisneros. There, the alien had been deported... It was a separate notice to appear, right, in Cisneros? Correct. So one proceeding was concluded and then the person came back. Right, but the BIA reasoned that because at the time that he came back, he had no immigration proceedings to delay, that was why he could start a new period. And the BIA looked to the specific purpose of the stop-time rule and said that the stop-time rule was intended to prevent aliens from delaying immigration proceedings. Well, the BIA here distinguished Cisneros, and it did not announce the broad proposition you would have it announce. It was based on a different factual scenario in any event. The BIA did note that factual difference. However, the BIA didn't explain why that difference should mandate a different outcome here, because the reasoning of the BIA in Cisneros applies equally here. Just as Cisneros had no immigration proceedings that he could have delayed when he entered the country, Mr. Nelson, when he left the country in 2000 and came back, there were no proceedings he could have delayed. And in Arca Pineda, this court held that that difference between aliens who re-enter and aliens who don't is rationally related to the specific purpose of the stop-time rule, which is to prevent that kind of delay. And the BIA's decision is also inconsistent with the case of Okeke, in which this court held that a lawful re-entry restarts the clock. Yeah, but that was also a different... You've got three different opinions in that case, and that wasn't this factual thing coming back after a conviction. That was the... Well, in Okeke, the alien had committed a controlled substance crime that did render him inadmissible, and he left the country and re-entered. Mr. Okeke did not cite the crime, did he? No. Right. The charging document in that case listed... Judge Garth relied primarily on that fact, it didn't even reach my decision. Well, the difference in charging documents, that's not relevant, because the BIA, in the case of Gerardo Delgado, held that difference, whether the crime that stopped the clock is listed on the notice to appear, that that does not affect application of the stop-time rule. It seemed to be, though, that it was significant in Judge Garth's opinion that the notice to appear in that document concerned Okeke's 1984 entry and didn't mention his earlier entries or crimes at all, and that seemed to play a very critical role in his analysis, and he accepted out the precise scenario we have here, did he not? Doesn't that make it the controlling authority in the Third Circuit? We are in the Third Circuit, I believe. Well, he didn't hold... Judge Garth did not say... He declined to decide how the issue would be resolved had the crime been listed on the charging document, but the fact that the BIA subsequently, in Gerardo Delgado, held that it does not matter, and the Supreme Court, in the case of Judling, which was decided in December of 2011, held that that difference in charging documents should not decide immigrants' fates when it comes to deportation. Let's talk about the stop-time provision because, really, your argument is that a new period starts when he came back from Canada. Now, there's a lot of confusion here. I mean, we're talking about Okeke, but you've got... there were three opinions in that. You've got split decisions in Mendoza. You've got split decisions in Cisneros. Doesn't that suggest... I mean, if judges are differing and the BIA... that the statute is ambiguous, and if it's ambiguous, shouldn't we defer to the BIA under Chevron? Well, if it is ambiguous, yes, you should defer, but only if the BIA provides a reasoned explanation for ruling inconsistently here, as it did in Cisneros and Okeke, or as this Court did in Okeke. The BIA did note those differences, that Cisneros involved two sets of charging documents, and that in Okeke, the charging document did not list... You're saying the Supreme Court now has invalidated Okeke because it's in conflict with a Supreme Court decision? No, I was citing the case of Judeling. In that case, it involved adjustment of status, but it looked at... It discussed... the fact that an immigration officer, if he decides to charge someone with a crime, a certain type of crime, that that would have an impact on an alien's later ability to get relief from deportation proceedings, whereas if the officer chose to charge the alien with a different crime for a different reason, that that could create a different outcome. It was that arbitrary effect of the charging decision that the Supreme Court held was arbitrary and capricious. Why shouldn't we say Okeke should be overruled? How should we deal with it? Well, not at this point, because Okeke looked... Okeke based its decision on Cisneros, which is a BIA decision. So in Okeke, the Third Circuit was interpreting the stop-time rule under the manner in which the board had already done so, and in Cisneros, the board focused on the delay and the lack of delay, and in Okeke, Judge Garth did the same thing in his opinion. In this case, there was no delay when Mr. Nelson left the country and re-entered. And the fact that since Okeke, the Third Circuit and Arca Pineda reaffirmed the reasoning of Judge Garth's opinion and how that it was rationally related to the stop-time rule, Okeke still is valid, and the holding of doodling does not affect the validity of that holding of Okeke, that a lawful re-entry restarts the clock. But that goes back to my first question, is that if you don't leave, you can't get cancellation, if the seven years have run. That is the current rule. And that's what we said in Brezeno-Flores. Well, Brezeno-Flores was different. That was like Mendoza, the BIA decision in which there was no re-entry. Right, there was no re-entry, but there was the commission of an offense. It wasn't based on a notice to appear stopping the clock. It was based upon the fact that he committed an offense within seven years of coming here. Well, I think that was a non-permanent resident in Brezeno-Flores, and he was attempting to show that he could have, because the language of the statute differs for non-permanent residents, he was asserting that he could count backwards from the date when he was served with a notice to appear. But that really, our case is about an alien leaving and re-entering. Right. And Brezeno-Flores involved did not... He never left. He never left. Right. So, under the current, the precedent, the BIA has to rule, has to hold that the clock restarted. And as the decision stands now, the BIA did not explain why it should not restart here. Well, they did give some explanation. You'd encourage those who commit a crime that stops their period from running, that stops it to leave and come back so that they're not barred permanently from seeking cancellation of removal. The BIA did hold that. However, it's very unlikely that aliens would take such a risk. Very few aliens would be sophisticated enough to actually leave the country and attempt to qualify for cancellation. That's a very broad statement. Do we have any evidence of that in the record? There is no evidence of that in the record. But the BIA did not explain, didn't provide any evidence of its own either. And so I don't see why the decision should be entitled to deference if the BIA is making such broad statements without backing it up with support or explaining it. I mean, your client, he left and came back with no problem. So I'm not so sure the BIA statement was wrong. I mean, it's a perfect example. Well, if the BIA allowed in Cisneros an alien who was already deported to come back and start a new period, the BIA didn't explain why the outcome should be different here. Here the alien was lawfully admitted. And if the BIA is going to allow an alien who illegally reentered to start a new period but not an alien who lawfully was admitted, then that's arbitrary. Going back to Judge Barry's original question, it just doesn't seem right that somebody who never leaves is ineligible for cancellation of removal, but somebody who leaves and comes back is. Well, you could, I mean, it is easier to delay proceedings or delay being caught if you just went into hiding. And, in fact, in the case of Mendoza, that is what happened. The aliens there, although they were served with a notice to appear, they did subsequently disappear for 10 years and stayed in the country. Here, if an alien leaves, he's inadmissible already under 1182, so he would be taking a huge risk trying to gain the system to come back. And my time is up. Thank you very much. Good morning. Good morning, Your Honor. Thank you. Jeffrey L. Mencken, United States Department of Justice for the Attorney General. May it please the Court. Your Honor, Congress required that a lawful permanent resident seeking cancellation of removal show seven years of continuous residence. And Congress also required that the accumulation of such residents terminate upon the institutional removal proceedings or on the commission of a specified offense. And there is no dispute here that Mr. Nelson's 1999 New York controlled substance conviction rendered him removable and is a disqualifying offense for purposes of the stop time rule. So I would state that the Board here reasonably found in its precedent decision that Mr. Nelson's period of continuous residence for cancellation ended when he committed his 1999 controlled substance offense. And he did not start a new period of continuous residence. Apparently it didn't end forever, though, did it? Well, under this fact pattern, Your Honor, it did terminate the residence that began in 1994. And that is the residence that was charged in the notice to appear on which the removal proceedings were based and on which Mr. Nelson committed. Oh, but under Cisneros, if he left and came back again, it didn't end for that purpose, did it? Cisneros, the deciding factor in Cisneros was that the removal proceedings, his original removal proceedings, had terminated. He was ordered removed, or rather he left. So in this case, I guess Mr. Nelson, if he was deported, he could come back in and start that clock running again. And you get seven years, he can see cancellation of removal. That is possible. There are limits on when he could return. But you concede he could start accruing the time. In Cisneros, if he was served in a separate proceeding after having been removed, that was the determining factor. Yeah, but in Mendoza, end means end, apparently. Well, yes. But in Cisneros, it doesn't. Isn't that the size of it? Well, there's no inconsistency. And I think the Board here explained that as well, that Mendoza terminate means terminate. In Cisneros, they said terminate there in the case of the service of an NTA means. It doesn't mean terminate anymore in Cisneros. Well, he's in new proceedings. And Mr. Nelson is seeking cancellation and removal in the original proceedings that were premised upon his 1994 entry. So the plain language controls here. I would point out also. The plain language controls, but the plain language would suggest that you start that clock running again upon entry into the United States or lawful entry or admitted into the country. Well, I can't predict. Of course, then you've got the 2008 convictions coming up, which are now final. Right. Yeah, Mr. Nelson, there's no scenario under which Mr. Nelson is eligible for cancellation. There's no claim that he's eligible for cancellation based on his 94 entry. The question is what happens in 2000. Well, we gave you that opportunity to take it back and just rely on the 2008 conviction, but you wanted us to go forward with this. Well, there's nothing wrong with the removal order is uncontested and there's a precedent decision laying out why he doesn't qualify. And nothing in the statute provides for the result. It says publish on the top of the opinion. Does that mean precedent? Yes, publish means precedent, and I use the two terms interchangeably. And this court routinely accords both Chevron and Brandeis deference to that. One thing that I would point out, we're talking about entry and admission as if they're the same thing, and they are not. Mr. Nelson is a lawful permanent resident, and there is a statutory presumption that a lawful permanent resident can come and go as frequently as he wishes, as long as he or she does not remain out of the country for a certain amount of time. And that statutory presumption is found in 8 U.S.C. 1101. Are you making this argument in your brief? I'm responding to my opponent. And the board also, in its decision, references the statute I started to cite, which is 8 U.S.C. 1101. A13C. And what that says is that a lawful permanent resident is presumed not to be seeking admission upon their return. He's reentering. And, in fact, this court, the idea is that they're simply resuming residence that had already begun. It's resumption of the admission. In fact, the regulation talks about readmission of a lawful permanent resident. It doesn't talk about admission of a lawful permanent resident. So Mr. Nelson has problems no matter which way we slice this. His 2000 return, his weekend in Canada, did not erase from the consequences of his criminal conviction. That, I would submit, is absurd. It also goes contrary to the purpose of the stop time rule, which is not limited to delaying of proceedings, because there's no allegation that somebody goes out and commits a controlled substance offense merely to delay his immigration proceeding. The purpose of the 1996 amendment, and we explain this in our brief, was to the reaction that criminal aliens or aliens who commit crimes were evading deportation and were manipulating the system. And nothing is more manipulative of the system than an ineligible alien lawful permanent resident spending a weekend in Canada to reset his clock. And I would submit he doesn't even have to spend the weekend. He can cross the bridge by Mr. Nelson's scenario, turn around and come back in, and then he gets a whole new clock, and that's just ridiculous. So unless the court has any other questions, I would sum up by saying that the board in this decision, in this precedent decision, reasonably interpreted the act. Both the plain language of the statute dictates the outcome, and even if there is some ambiguity, there's no showing that the board's decision here is impermissible. One could say that there are other ways that they could have decided that, but under Chevron and Brandax, deference is required if the court's interpretation of the statute that it is charged in enforcing is reasonable. I do have a couple of follow-up questions. Sure. Because the statute talks in terms of residing in the United States continuously for seven years after having been admitted in any status, and I guess now you're telling us that he was not admitted because there's a presumption he's simply reentering as a lawful permanent resident. The statutory presumption is that a returning lawful permanent resident is not seeking an admission. There was no allegation in Mr. Nelson's represented board appeal that he was an alien seeking admission in 2000. So there's an absence of proof. So on this record, there's no showing that the idea that a lawful permanent resident produce their card may be procedural, but it is not an event, an admission for immigration purposes. Is it a lawful entry? That, according to my Mr. Nelson, is irrelevant. The question here is whether that's an admission for purposes of law. And the presumption is that it is not, and there was no claim below that that presumption was overcome. And so as a matter of law, he can drive back and forth over the border all he wants. That doesn't give him another seven-year clock every time. So you're saying whether he was lawfully admitted is not a relevant factor here. When he came back from Canada. It has consequences in other contexts, but I would say no, it wouldn't here. So, Your Honor, I would submit that Mr. Nelson's two-day trip to Canada does not requalify him under the statute, and we would ask that the board's decision be upheld. Well, how should we deal with Okeke, if at all, in this case? I think Okeke, at the most, can be limited to its peculiar circumstances and the facts of that case. The notion that, to the extent that the majority of Judge Garth was, as my opponent said, Okeke was based on Cisneros. Well, the board is entitled, and in fact I would say obligated, to say that that reading of Cisneros is not what we meant to say. And that is commonly done. And that's what it did in the Nelson published decision, saying we did not intend to set out the broad proposition that if you set foot out of the country and then return right away, new clock. That's the board's job, and that's what they did. Thank you. Thank you. Thank you, Mr. Mencken. Ms. Sawicki? Okay. So just to clarify, Mr. Nelson was seeking admission when he entered the country in August of 2000. We talk about it in our opening brief at page 38. Because he committed a crime of inadmissibility under 1182, that rendered him inadmissible. And that also shows, so that helps our plain language argument, because under the language for permanent residence, which this court had no occasion to consider in August. I have a little trouble following this argument, because on the one hand you say he was inadmissible, but he was lawfully admitted. He was lawfully, so he was inadmissible when he first, when he was in Canada and wanted to come back. But once he passed through border inspection and showed his green card, he was then admitted under 1101. So, and then under 1229BA2, he was admitted in any status, and he began accruing time at that point. Was it lawful admission, or what kind of admission was it? It was a lawful admission. You say under Quinlada it was procedurally lawful, and that's all that matters? Yes, that is all that matters under Quilontan. And so just to also clarify, this decision is still arbitrary, even if the BIA said that it did not mean what it said in Cisneros, because there's no reason the outcome should be different here. Again, Cisneros, that involved an illegal reentry after a deportation. Why should that alien be allowed to come back and start time again when Mr. Nelson, who had not been deported and was admitted after showing his green card, why he should not get the same relief? Because the BIA's decision is inconsistent, and it did not provide a reasoned explanation for that inconsistency with precedent, it should be reversed and the case should be remanded. Thank you very much. Let me congratulate Ms. Sawicki on a marvelous job here, and certainly I'd like to commend the Earl Mack School of Law at Drexel University for the marvelous work that they did. We certainly appreciate, as judges, receiving such finely prepared briefs and then having the benefit of well-prepared arguments. So thank you very much, and you should be commended. May I say something? Yes. I remember two of my former lives ago making my first appearance before this court. I was never so terrified in my life. I don't think I ever will be in the rest of my life. And you didn't let it show, if you were. You looked perfectly calm. Your knees weren't knocking like mine were. You took me back to something years ago, and I'm very, very proud to have you in this court. Thank you. Thank you very much. All right.